## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**Martin V. Webb,** *et al.***,**

        **Plaintiffs,**

**-v-**
        **Case No. 2:05-cv-0548**
        **JUDGE SMITH**
        **Magistrate Judge King**

**Chase Manhattan Mortgage Corporation,**

        **Defendant.**

### OPINION AND ORDER

Plaintiffs filed this putative class action on June 3, 2005 (Doc. 1). Defendant moved to dismiss (Doc 21). On March 5, 2007, this Court granted in part and denied in part Defendant's Motion to Dismiss, dismissing Counts II, IV, V, and VII of the Amended Complaint (Doc. 31). Plaintiffs have three remaining claims against Defendant, a Real Estate Settlement Procedures Action, 12 U.S.C. §2601, *et seq*. ("RESPA") claim (Count I), breach of contract (Count III), and breach of the covenant of good faith and fair dealing (Count VI). Defendant has now filed a Motion for Summary Judgment as to each Plaintiff on the remaining claims (Docs. 49 and 50). Plaintiffs have filed their response, and these motions are now ripe for review. For the reasons that follow, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff Webb's claims and **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff Carter's claims.

## I.    BACKGROUND

Plaintiff Martin V. Webb is a resident of Kingston, Tennessee whose home-secured loan was serviced by Defendant Chase during the period covered by this action.  Plaintiff Waltraud Carter is a resident of Aurora, Colorado whose home-secured loan was serviced by Defendant Chase during the period covered by this action.

Defendant Chase Manhattan Mortgage Corporation ("Chase") is a New Jersey corporation with its headquarters and principal place of business in New Jersey.  Its parent, J.P. Morgan Chase ("JPM"), is located at 270 Park Avenue, New York, New York, 10017.  JPM, however, has not been named as a Defendant.  Nonetheless, Plaintiffs allege that JPM colluded with Chase to, *inter alia*, funnel prospective borrowers to Chase with full knowledge of its illegal and other improper practices described herein.

Plaintiffs Webb and Carter bring this action on behalf of themselves and all those whose loans were serviced by Chase on or after August 1, 1999 and/or who were affected, or whose loans and/or escrowed funds were affected by at least one of the following practices:

a.    assessment of excess or improper force placed hazard insurance premiums and assessment of improper flood insurance premiums;

b.    accepting the mortgagor's payments (and negotiating any checks issued pursuant thereto) and placing the funds received in "suspense" in lieu of timely crediting them to the mortgagor's account;

c.    negotiating payments made by or on behalf of the mortgagor but failing to credit them timely to the mortgagor's account;

d.    incorrectly posting amounts received on account;

e.    failing to keep and provide to Class members comprehensible and accurate records of amounts received from mortgagors on account;

f.    assessing late fees on payments that had been received by Chase when due; and

g.    improperly using funds held by Chase in escrow to benefit itself and otherwise misusing such funds.

Plaintiffs' claims are based on form loan documents, standardized servicing practices,

form letters, and accounting standards that were used or implemented by Chase on a nationwide basis.  Chase controlled and implemented the challenged practices, including those carried out by Chase from within this District and from its headquarters in Edison, New Jersey.

Plaintiffs allege that Chase engages in a uniform scheme and course of conduct to inflate its corporate profits by force placing hazard insurance on properties which secure the mortgages that it services. If a borrower fails to purchase or maintain hazard insurance on his or her property, according to standard mortgage instruments, the mortgagee can "force place," or purchase insurance itself to protect the mortgagee's rights in the property, then pass the actual cost of such coverage to the borrower.  Chase, however, routinely force places insurance unnecessarily where the borrower actually has insurance in place and/or where Chase improperly failed to make insurance payments from the borrowers' escrow accounts. Chase also routinely obtains coverage in amounts which do not fairly reflect the mortgagors' interest in the underlying properties consistent with Chase's fiduciary obligations to such borrowers.  Plaintiffs allege that Chase receives kickbacks or other disguised benefits from the insurance companies from which it purchases such insurance and does not obtain coverage at the lowest available cost to borrowers.

Further, Plaintiffs allege that Chase routinely fails to respond to borrowers' written disputes or requests for information made pursuant to RESPA; fails to notify borrowers that it has force placed insurance, that it has imposed fees and charges, and that it will collect unjustified attorneys' fees and other charges in connection with collection and foreclosure activities; fails to promptly and accurately credit their accounts when payments are made; and otherwise fails to provide accurate or timely information to borrowers concerning their accounts.

Plaintiffs assert that Chase, in association with others, has engaged in a course of conduct to inflate its corporate profits by force placing hazard insurance on properties which are subject to mortgages that it services or owns, based on standard mortgage instruments which provide that the mortgagee can do whatever is necessary to protect the mortgagees rates and the property. In procuring this "coverage," however, Chase routinely bills and attempts to collect from the borrowers alleged "premium disbursements" for the force placed insurance that far exceed the ordinary charges for the former or existing policies for the same properties and/or which would be commercially available to it to insure its own insurable interests on a mass or other basis.

Plaintiffs therefore assert that Chase unreasonably and unconscionably inflates its purported "disbursements" to purchase the insurance and, rather than just protecting its lien interest, actually profits from the force placement and inflates the borrower's mortgage loan balance and interest charges as a result.  In addition, Plaintiffs claim that Chase also causes insurance to be placed after-the-fact and then falsely backdated to far earlier periods, which generates purely risk-free premiums and profits, since both Chase and the insurers know at the time, or recklessly disregard the fact, that no claim has been or could have been made during that expired time. Thus, Chase and the insurers falsely charge Class members for utterly useless and non-existent insurance coverage.

**A.**      **Plaintiff Martin Webb**

In March 2003, Plaintiff Webb obtained a mortgage from Mortgage Investors Group ("MIG") on his residential property in Kingston, Tennessee in the amount of $147,175.00.  In connection with this transaction, Plaintiff executed, among other things, a Deed of Trust dated March 28, 2003.

The Deed of Trust Plaintiff Webb signed required him to maintain hazard insurance on

the property "in the amounts and for the periods that Lender requires."  (Am. Compl. ¶ 52).

Specifically, Section 4 of the Deed of Trust provides:

> **4.     Fire, Flood and Other Hazard Insurance.**  Borrower shall insure all
> improvements on the Property, whether now in existence or subsequently erected,
> against any hazards, casualties, and contingencies, including fire, for which
> Lender requires insurance.  This insurance shall be maintained in the amounts and
> for the periods that Lender requires . . ..  All insurance shall be carried with
> companies approved by the Lender.  The insurance policies and any renewals
> shall be held by Lender and shall include loss payable clauses in favor of, and in a
> form acceptable to, Lender.

(Ex. B to Baker Aff.).  If Plaintiff Webb fails to maintain hazard insurance on the property, the

Deed of Trust permits the lender to obtain replacement coverage.  Specifically, Section 7 of the

Deed of Trust provides:

> **7.     Charges to Borrower and Protection of Lender's Rights in the Property.**
> If Borrower . . . fails to perform any other covenants and agreements contained in
> this Security Instrument . . . then Lender may do and pay whatever is necessary to
> protect the value of the Property and Lender's rights in the Property, including
> payment of taxes, hazard insurance and other items mentioned in paragraph 2.
> Any amounts disbursed by Lender under this paragraph shall become an
> additional debt of Borrower and be secured by this Security Instrument.  These
> amounts shall bear interest from the date of disbursement, at the Note rate, and at
> the option of Lender, shall be immediately due and payable.

(Ex. B to Baker Aff.).

At the time Plaintiff entered into the mortgage, his property was insured with Tennessee

Farmers Mutual Insurance Company ("TFI").  The policy period was from July 18, 2002 through

July 18, 2003.  The total yearly premium for that policy was $630.00 and provided coverage of

$179,000 for the dwelling, $26,900 for other structures, and $134,300 for personal property.  The

policy also including coverage for personal liability and medical payments to others.  (Am.

-5-

Compl. ¶ 54).[1]

Prior to the March 28, 2003 closing, the Webbs sent a Property Underwriting Change Request to TFI, instructing them to change the mortgagee under the Webbs' hazard insurance policy, to delete as mortgagee Chase Manhattan[2] and add as mortgagee MIG.  (Knight Depo. at 37-39).  The Property Underwriting Policy Change Request was signed by Donna Webb and dated March 19, 2003.

After receiving the Property Underwriting Change Request, TFI changed its records to reflect that MIG was the mortgagee on the Webb's hazard insurance policy.  As a follow up, TFI mailed an Amended Declaration to the Webbs listing MIG in the mortgagee clause.  (Knight Depo. at 50-51).

On or about May 16, 2003, MIG sent Plaintiff Webb a Notice of Transfer of Servicing Rights instructing him to make mortgage payments to Chase beginning with his June 2003 mortgage payment.  Plaintiff was instructed to make his June payment in the amount of $1,083.75 to Chase at an address in Phoenix, Arizona.  In accordance with this letter, Plaintiff Webb timely sent his June payment to Chase and continued to make timely payments to Chase. (Am. Compl. ¶¶ 50-51).   The notice further instructed Plaintiff that "[a]ll payments, inquiries, tax and insurance bills" should be directed to Chase."  (App. 4 to Def.'s Mot. for Summ. J. as to Pl. Webb).

In connection with MIG's sale of the Webb's loan and transfer of the servicing rights to

---

[1] Ms. Vickie L. Knight with Tennessee Farmers Mutual Insurance Company confirmed Plaintiff Webb's insurance coverage, however, the amounts of coverage differ slightly.  The total coverage for the policy was $199,600, with $173,500 for the dwelling and $26,100 for other structures.

[2] Chase had been the servicer of the mortgage the Webb refinanced on March 28, 2003.

Chase, MIG prepared an Insurance Endorsement Request dated April 10, 2003, requesting that the mortgagee clause on the Webb's hazard insurance policy be changed to Chase.  However, MIG has no record that this document was actually sent to TFI, nor do they have any record of receiving it.  (Knight Depo. at 54-55; Rhea Depo. at 42-43).

On June 19, 2003, TFI sent MIG a Statement of Insurance Premium Due requesting payment out of escrow of premiums due on the Webbs' hazard insurance.  (Knight Depo. at 59-60).  This statement was for the policy period commencing July 18, 2003 through July 18, 2004.  At the same time, TFI also sent a copy of this Statement to the Webbs which stated that "YOUR MORTGAGE HAS BEEN BILLED."  (Knight Depo. at 59-60; Ex. 13).  No copy of this Statement was sent to Chase because according to their records, MIG was the mortgagee under the Webbs' insurance policy, not Chase.  (Knight Depo. at 60-61).

On June 20, 2003, TFI sent the Webbs a Renewal Certificate for the hazard insurance on their property for the policy period July 18, 2003 through July 18, 2004.  The Renewal Certificate stated that the mortgagee on the Webbs' policy was MIG.  This Renewal Certificate was accompanied by a letter addressed to the Webbs that stated:

> Enclosed is the declaration for your property insurance policy.  Your policy has a mortgage company listed as you requested.  Sometimes mortgage companies cannot identify the proper account to which an insurance policy applies unless their mortgage account number is listed on the policy.  Please check your payment book or mortgage records to find the account number for
> MORTGAGE INVESTORS GROUP
> Please write the loan number on the line provided below:
> _____
>
> Return this letter to us and we will add the account number to our policy.  We want to be sure the mortgage company is able to identify your account when we send them mail for this policy number in the future.
> Thank you for allowing us to service your insurance needs.

(Knight Depo. at 61-63; Ex. 15).

On July 22, 2003, TFI sent the Webbs a Final Notice because they did not receive a premium payment for the Webbs' hazard insurance policy by the July 19, 2003 due date.  The Final Notice informed the Webbs that their premium payment had not been received and that their policy had expired as of July 18, 2003, "for non-payment of the renewal premium." (Knight Depo. Ex. 18).  The Webbs were further advised that to reinstate their policy "with continuous coverage," their payment needed to be received by August 1, 2003.  There is no evidence that the Webbs responded to the Final Notice, nor any of the previously mentioned correspondence sent by TFI.  No payment was received by August 1, 2003, therefore the Webb's hazard insurance policy was cancelled as of July 18, 2003.

On September 10, 2003, Chase sent correspondence to the Webbs informing them that they did not have current hazard information on their account.  Specifically, the letter provided:

> During a recent audit of our files, it was determined that we did not have current hazard insurance information for your account.  We requested your assistance to update your account.  Under the terms of your mortgage agreement, we are required to have current insurance information on file.  Please contact your agent or company to verify your policy includes a mortgage clause which reads:

> > CHASE MANHATTAN MORTGAGE CORPORATION
> > ITS SUCCESSORS AND/OR ASSIGNS
> > P.O. BOX 47020
> > DORAVILLE, GA 30362

> A correct mortgagee clause, including your loan number, will ensure that we receive future insurance notices in a timely manner and will enable the prompt payment of insurance premiums on your behalf.  Please have your agent forward your current insurance information to the address shown above or fax the policy information to the Insurance Department at 678-475-8799.

> It is important that we receive this information within 15 days from receipt of this letter.  To ensure prompt service, please include your loan number on all correspondence mailed or faxed to our office.

Thank you for taking the time to help us with this request.

(Baker Aff. ¶ 6).  The Webbs did not contact Chase in response to this letter.  (Baker Aff. ¶ 7).

Plaintiff Webb acknowledges receiving a letter from Chase on October 27, 2003, advising him that Chase did not have his current insurance policy information and requested that he fax or have his agent fax proof of coverage to Chase.  (Am. Compl. ¶ 56).  The letter further stated that

> If you do not have hazard insurance coverage for your property or we are unable to confirm that your property is adequately insured within the next thirty days, we will obtain insurance for you.  This policy will remain in place until you are able to provide us with evidence of coverage.  If we purchase this insurance . . . your monthly payments will increase.

(Baker Aff. Ex. G).  The letter further informed the Webbs that the cost of insurance obtained by Chase "is likely to be much higher than insurance you obtain on your own . . . because the insurance we obtain is not based on the insurance company's appraisal of your home."  The letter also stated:

> If Chase purchases insurance for you, an affiliate of Chase may benefit.  This may occur because the insurance company will transfer some or all of the risk under the policy to a Chase affiliate in return for a portion of the insurance premium.  This is called reinsurance and may result in a financial gain to the Chase affiliate.  The reinsurance arrangement will not change your insurance premium.

(*Id*.).  This letter continued, providing specifics on the costs and coverage if Chase obtained insurance for the Webbs.

In response to this letter, Plaintiff Webb called his insurance broker who informed him that the insurance had been cancelled for non-payment.  Plaintiff Webb reinstated the policy with an effective date of November 7, 2003, but at a higher price than he had previously paid for the same coverage.  Plaintiff Webb paid the insurance premium for the year and provided this

-9-

information to Chase.  (Am. Compl. ¶ 57).

In a letter dated November 10, 2003, Chase advised Plaintiff Webb that "we have updated our records to show the current information.  The temporary coverage that we obtained was canceled effective November 7, 2003."  The letter continued "an insurance premium of $845.00 will be charged to your account for the period of time that the temporary coverage was in place."  (Am. Compl. ¶58).  The temporary coverage was in place from July 18, 2003 to November 7, 2003.  Included with this letter was an insurance binder from American Security Insurance Company ("ASIC") outlining Plaintiff Webb's coverage.  It showed Plaintiff's coverage was $199,600, more than required under his agreement, and the annual premium was $2,754.00, more than four times what Plaintiff's premiums on his original insurance policy. (*Id.*).

Plaintiff Webb claims that Chase did not purchase this insurance until October 2003, but backdated it pursuant to an agreement they had with ASIC to July 18, 2003, a period which they knew there were no claims made or damage to the property.

According to Plaintiff Webb's annual escrow account disclosure statement dated February 25, 2004, Chase disbursed the premium for the ASIC insurance on or about November 3, 2003, shortly after it advised Plaintiff to provide proof of coverage and during the 30 day period Chase had advised Plaintiff he had to advise Chase about his insurance coverage.  In addition, Chase increased Plaintiff's monthly escrow payment to cover the additional charge for the foreclosure premium.  (Am. Compl. ¶ 61).

**B.     Plaintiff Waltraud Carter**

-10-

On May 24, 2001, Plaintiff Waltraud Carter obtained a mortgage loan for $239,400 from First Union Mortgage which was serviced by Preferred Data Systems in Highland Ranch, Colorado.  Plaintiff signed a note and deed of trust.  First Union sold the mortgage to Defendant Chase effective December 1, 2001.  In June 2002, Plaintiff Carter filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code.  In September 2002, Plaintiff was discharged from bankruptcy.  The bankruptcy case was closed on June 25, 2004.

Plaintiff's Deed of Trust authorized Chase to hold partial payments that were insufficient to bring her account current in an unapplied funds account (or suspense account).  Specifically, Section 1 of the Deed of Trust provides:

> **1.      Payment of Principal, Interest, Escrow Items, Prepayment Charger, and Late Charges.**
> Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for escrow items pursuant to Section 3.
>
> *      *      *
>
> Lender may return any payment or partial payment if the payment or partial payment is insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudiced to its right to refuse such payment or partial payment in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payments to bring the Loan current.

(Baker Aff. Ex. B).

The Deed of Trust defines "Periodic Payment" as the "regularly schedule amount due for: (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument."  (Baker Aff. Ex. B).  Under Plaintiff Carter's Note, her monthly payments were due

on the first day of each month.  The amount due included escrow items (i.e. property taxes and

insurance).  The Note authorized Chase to impose a late charge when Plaintiff failed to make her

full monthly payment within a specified grace period following the due date.  (Baker Aff. Ex.

A).  Specifically, the Note provides as follows:

> **6.      BORROWER'S FAILURE TO PAY AS REQUIRED**
>
> > **(A)      Late Charge for Overdue Payments.**
> > If the Note Holder has not received the full amount of any monthly
> > payment by the end of 15 calendar days after the date it is due, I will pay a
> > late charge to the Note Holder.  The amount of the charge will be 05% of
> > my overdue payment of principal and interest.  I will pay this late charge
> > promptly but only once on each late payment.

(Baker Aff. Ex. A).

The Deed of Trust also authorized Chase to obtain reimbursement for bankruptcy

attorneys' fees it incurred in protecting its rights in Plaintiff's mortgaged property.  (Baker Aff.

Ex. B).  Specifically, the Deed of Trust provides:

> **14.    Loan Charges.**    Lender may charge Borrower fees for services performed
> in connection with Borrower's default, for the purpose of protecting Lender's
> interest in the Property and rights under this Security Instrument, including, but
> not limited to, attorneys' fees, property inspection and valuation fees.

(*Id.*).

At the time Chase began servicing Plaintiff Carter's mortgage, her monthly mortgage

payment was $1,992.06.  On July 29, 2002, Chase sent Plaintiff an escrow analysis effective for

Carter's September 1, 2002 mortgage payment, which adjusted her monthly payment amount

from $1,992.06 to $2,042.42.  (Baker Aff. ¶ 5).  Chase sent Plaintiff Carter monthly statements

for September and October 2002, which indicated that Carter's monthly payments were

$2,042.42.  (Baker Aff. Exs. G and H).  On October 10, 2002 and November 16, 2002, Plaintiff

made partial loan payments to Chase of $1,992.06.  (Baker Aff. ¶7, Exs. C and D).  Because the payments were less than Plaintiff's monthly mortgage payment of $2,042.42, the payments were placed in a suspense account, creating a suspense account balance of $3,984.12.  Plaintiff Carter did not make any mortgage payment to Chase in December 2002.[3]

On December 27, 2002, Chase deducted $2,042.42 from Plaintiff Carter's suspense account and applied it as her October 2002 payment.  This left Plaintiff's suspense account balance at $1,941.70.  In January 2003, Chase received a payment on Carter's account of $1,992.06.  This payment was combined with $50.36 from Carter's suspense account and applied as the November 2002 mortgage payment.  A balance of $1,891.34 remained in the suspense account.  (Baker Aff. 11 Exs. C and D).

As a result of Plaintiff Carter's failure to pay her monthly mortgage payments in full for the four months from October 2002 through January 2003, Chase assessed a late charge of $84.72 for each of those months.  (Baker Aff. ¶ 12 Exs. C & D).

On January 22, 2003, Chase's bankruptcy counsel communicated the following reinstatement figures to Plaintiff's bankruptcy counsel:

> December 2002 and January 2003
> mortgage payments of $2,042.42 each......................................$4,084.84
>
> October 2002 through January 2003
> late charges of $84.72 per month...................................................$338.88
>
> Chase's bankruptcy attorneys' fees..............................................$725.00
>
> Suspense account balance...................................................... [$1,891.34]

---

[3] There is no reference to Plaintiff's September 2002 payment.  Defendant Chase indicates that the mortgage payment increased effective September 1, 2002 based on the escrow analysis, then simply skips to the October, November and December 2002 payments.  The Court will therefore assume that Plaintiff's September payment was paid in full.

TOTAL:  $3,257.38

(Baker Aff. ¶ 13, Ex. I).

Plaintiff Carter and Chase, through their bankruptcy counsel, agreed to compromise the reinstatement amount by deducting two late charges totaling $169.44, for a total reinstatement amount of $3,087.94.  (Baker Aff. ¶ 14).  Chase received checks from Plaintiff and her bankruptcy counsel totaling $3,087.94.  On January 30, 2003, these checks were applied to Plaintiff Carter's loan and her loan was then current.  (Baker Aff. ¶ 16).

Around the same time as the reinstatement funds were processed, Chase received Plaintiff Carter's February mortgage payment of $2,0422.42.  This payment was processed manually and inadvertently misapplied to principal curtailment, rather than to the February 2003 payment.  Plaintiff Carter received bankruptcy mortgage statements from Chase dated January 31 and February 4, 2003, reflecting that the funds were posted to principal.[4]  (Baker Aff. ¶¶ 18-19).

Because of the admitted error by Chase in applying Plaintiff's February 2003 payment to principal, each of Carter's subsequent monthly payments was treated as a month late, and she was assessed a late charge of $84.72 each month  for February 2003 through September 2003.  (Baker Aff. ¶ 20).

On September 26, 2003, Plaintiff Carter refinanced her mortgage and paid off her loan with Chase with a payment of $234,090.12.  However, the balance on Plaintiff's loan was $234,674.47, consisting of $231,258.49 in principal, $2,677.22 in interest, $677.76 in late

---

[4] Each time Chase received a payment from Plaintiff Carter, Chase sent her a statement reflecting how the funds were applied.

charges, and $61.00 in fees.  At the time of Plaintiff's payoff, she had an escrow balance of

$227.58, and a balance of $931.21 in her unapplied funds account.  The difference between the

amount Chase received from Plaintiff and the payoff amount was $584.35.  Therefore, Chase

deducted $73.96 from Plaintiff's escrow account and $510.39 from her unapplied funds balance

to pay the shortfall.  Plaintiff Carter's remaining escrow balance of $153.62 was used to make

her final disbursement for private mortgage insurance premium on September 29, 2003.  The

remaining unapplied funds balance of $420.82 was returned to Plaintiff in October 2003.

Plaintiff Carter did not pay a prepayment penalty in connection with paying off her loan.  (Baker

Aff. ¶ 24).

 Plaintiff claims that the payoff amount Chase gave her contained interest for three

months which had previously been paid.  While Plaintiff admits that Chase did refund her

improperly charged late fees and the attorneys' fees charged for the bankruptcy proceeding, she

claims Chase refused to refund any of the unapplied payment or interest thereon.  Plaintiff Carter

therefore asserts that she was forced to expend an additional $7,500.00 to refinance her home.

 After Plaintiff Carter paid off her loan with Chase in September 2003, Chase began

receiving correspondence from her on a variety of issues.[5]  Between December 2003 and July

2004, Chase received seven pieces of written correspondence from Plaintiff Carter complaining

about her account.  Chase responded to each of these letters.  (Baker Aff. ¶ 26, Exs. N and O).

On June 22, 2004, Chase sent Plaintiff Carter a refund of $847.20 for ten $84.72 late charges that

---

[5] The Amended Complaint references a call made by Plaintiff to Chase in August 2003 questioning the past due amounts, late charges, and the suspense funds account balance.  (Am. Compl. ¶ 70).  Plaintiff claims she sent Chase documents showing her February 2003 payment and requesting Chase update their records and remove any derogatory reports made to credit bureaus.  Plaintiff claims that Chase never responded to her in any fashion.  It appears, however, that these issues were resolved in later written correspondence.

were incorrectly assessed.  Chase also requested the credit reporting agencies remove any references to delinquent payments from Plaintiff's credit.  (Baker Aff. ¶ 27).  Plaintiff responded on July 14, 2004, acknowledging the payment as a partial payment.  Plaintiff Carter also made a number of other demands to Chase, including that Chase refund the attorneys' fees of $725.00 because "there was no need to initiate foreclosure proceedings."  (Baker Aff. Ex. O).

Chase then responded to Plaintiff on July 29, 2004, and in an effort to resolve Plaintiff's issues, sent her a check for $725.00 for the attorneys' fees.  Chase, however, disputed Plaintiff's demand for the unapplied funds and instead provided the explanation of how such funds were applied to her account.  Plaintiff alleges that there are approximately $2,000 of unapplied funds owed to her that were never credited to her account.  Further, she claims she was forced to expend an additional $7,500 to refinance her home because of the improper business practices and tactics of Chase.  (Am. Compl. ¶ 76).

Based on the factual allegations set forth in the Amended Complaint, Plaintiffs initially brought seven claims against Defendant.  This Court, in its March 5, 2007 Opinion and Order, dismissed all but three of Plaintiffs claims.  The remaining claims are: violation of RESPA, breach of contract, and breach of good faith and fair dealing.  The Court will address each of these in turn.

## II.   SUMMARY JUDGMENT

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which

provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[6]  The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is

---

[6] *Reeves* involved a motion judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby*, *Celotex*, and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (*quoting Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (*quoting Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III. DISCUSSION

Defendant Chase asserts that it is entitled to summary judgment on Plaintiffs' claims of

violation of the Real Estate Settlement Procedures Action, 12 U.S.C. §2601, *et seq*. ("RESPA"), breach of contract, and breach of good faith and fair dealing.  The Court will address each of these in turn.[7]

**A.  Count I – Violations of RESPA**

Plaintiffs asserts that Chase violated and is violating RESPA by the following conduct:

a.  failing to meet the requirement of 12 U.S.C. §2605 regarding responding to qualified written requests and making appropriate corrections to borrowers' accounts;

b.  failing to meet the requirements of 12 U.S.C. §2605 regarding making timely payments of taxes and insurance from escrow accounts.

(Am. Compl. ¶ 78).  Section a applies to Plaintiff Carter and section b applies to Plaintiff Webb. Each will be addressed in turn.

**1.  *Plaintiff Carter's RESPA Claim***

Plaintiff Carter asserts that there is a question of fact as to whether Chase received a letter from her dated September 9, 2003.  Plaintiff also asserts that Chase did not take any corrective action within 60 days of her letters dated December 1, 2003 and March, 3, 2004.  Finally, Plaintiff Carter asserts that Chase violated RESPA because Chase "has never credited or returned plaintiff's September, 2003 payment to this day."  (Carter's Response at 15).

RESPA, Section 2605, sets forth certain duties of a loan servicer after receiving borrower

---

[7] Plaintiffs make an initial argument that Defendant's motions are premature as they need certain discovery to respond to their allegations.  Plaintiffs, however, have had ample time to conduct discovery in this case, and therefore, the Court finds that Defendant's motions are ripe for review.

inquiries.  Specifically, the Section requires servicers to respond to a "qualified written request" from the borrower within 20 days of receipt.  *See* 12 U.S.C. § 2605(e)(1)(A).  The section also mandates that the servicer take certain actions within 60 days following the borrower's inquiry.  *See* 12 U.S.C. § 2605(e)(2).

RESPA, 12 U.S.C. § 2605, provides, in pertinent part, as follows:

(e) Duty of loan servicer to respond to borrower inquiries

    (1) Notice of receipt of inquiry

        (A) In general.  If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.

        (B) Qualified written request.  For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--

            (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

            (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

    (2) Action with respect to inquiry. Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall--

        (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

        (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

-20-

> (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
>
> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
>
> > (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
> > (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

Plaintiff Carter's claims are brought under the Cranston-Gonzales Amendments to RESPA. The Cranston-Gonzales Amendments are a limited statutory scheme, applying only to letters that satisfy the criteria for a "qualified written request" as set forth in the Act. The criteria for a "qualified written request" is defined above in § 2605(e)(1)(B)(i) and (ii). The Cranston-Gonzales Amendments, as set forth in detail above, instruct that any servicer of a loan that receives a qualified written request from the borrower for information relating to the servicing of the loan, must provide a written response acknowledging receipt of the correspondence within 20 days and then within 60 days, and the servicer must do one of three things:

> (1) correct the borrower's account and inform the borrower of those corrections in writing; (2) investigate and provide a written explanation to the borrower of the reasons that the servicer believes the borrower's account is correct; or (3) investigate and provide a written explanation to the borrower of the reasons that the servicer cannot obtain the information that the borrower is requesting.

*Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 868 (N.D. Ill. 2002) (*citing Johnstone v. Bank of Am., N.A.*, 173 F. Supp. 2d 809, 812 (N.D. Ill. 2001) and 12 U.S.C. § 2605(e)(2)).

Response to a qualified written request under RESPA is conditioned upon actual receipt

-21-

of the qualified written request—"[a] party to the loan transaction is not subject to RESPA

requirements for responding to a qualified written request unless that party actually received the

qualified written request." *Morilus v. Countrywide Homes Loans, Inc.*, 2007 U.S. Dist. LEXIS

44943 (E.D. Pa. June 20, 2007).  Though Plaintiff Carter claims that she sent Chase a qualified

written request on September 9, 2003, among other correspondence, Chase did not receive the

correspondence, and therefore, Chase had no obligation under RESPA to respond in any way.

Defendant Chase has set forth in detail their analysis of the correspondence in question and

Chase's responses based on Deborah Baker's testimony and affidavit.

- September 9, 2003 – Chase has no record that it received this letter until Carter enclosed it with subsequent correspondence.
- December 1, 2003 – Chase received it on December 4, 2003, and responded on December 24, 2003
- March 3, 2004 – Chase received it on March 8, 2004, and responded on March 18, 2004 (acknowledgment); April 6, 2004 (response)
- March 11, 2004 – letter from the Better Business Bureau forwarding Carter's March 4, 2004 claim – Chase received it on March 18, 2004, and responded on March 25, 2004
- April 8, 2004 – letter from the Better Business Bureau forwarding Carter's March 31, 2004 letter to Chase – Chase received it on April 12, 2004, and responded on April 28, 2004
- May 26, 2004 – letter from the Better Business Bureau forwarding Carter's May 17, 2004 letter to Chase – Chase received it on June 1, 2004, and responded on June 22, 2004
- July 14, 2004 – Chase received it on July 21, 2004, and responded on July 29, 2004

Chase therefore asserts, and this Court agrees, that Chase has responded to all

correspondence it received from Plaintiff Carter within the timeframes prescribed by RESPA.

Ms. Baker's affidavit establishes that Chase maintained an admissible and reliable

contemporaneous business record of all correspondence that it received from Plaintiff Carter

(including copies of the correspondence), and that Chase has no record that it received the

September 9th letter until it was enclosed with subsequent correspondence.  (Baker Aff. ¶ 23, 26,

28, Exs. N, O).  Contrary to Plaintiff Carter's argument, there is no genuine issue of material fact

as to whether Chase received the September 9th letter because Chase has rebutted the

presumption of receipt, and Carter has failed to present any evidence to confirm Chase's receipt.

The presumption of receipt of a piece of mail "is rebutted upon the introduction of evidence

which would support a finding of the nonexistence of the presumed fact.  Testimony of non-

receipt, standing alone, would be sufficient to support a finding of non-receipt; such testimony is

therefore sufficient to rebut the presumption of receipt."  *Bratton v. The Yoder Co. (In re Yoder*

*Co.)*, 758 F.2d 1114, 1118 (6th Cir. 1983).  Therefore, to the extent Plaintiff Carter's RESPA

claim is based upon the September 9th letter, there is no genuine issue of material fact, and

Defendant Chase is entitled to judgment as a matter of law.

        With respect to the remaining correspondence, Plaintiff Carter alleges that Chase did not

take corrective action with 60 days.  As set forth above, however, Chase responded to all

correspondence it received from Carter.  Plaintiff Carter appears to ignore the responses actually

received and instead asserts that she did not received the corrective action she requested.  She

has requested Chase to credit or return her September 2003 payment and claims it has not been

done to date.  Chase, however, credited this payment to Plaintiff Carter's account on September

10, 2003, and Plaintiff has presented no evidence to the contrary.  (Baker Aff. Exs. C, D).  The

Court finds that Defendant Chase responded to all the correspondence it received from Plaintiff

Carter within the timeframes prescribed by RESPA.

        Even if Plaintiff Carter could establish that Defendant Chase failed to timely respond to a

qualified written request, her RESPA claim would still fail because she cannot establish any

actual damages.  If a loan servicer violates §2605(e), §2605(f) provides for remedies to the

borrower.  However, remedies for violations of §2605(e) are conditioned upon actual damages to

the borrower.  Section §2605(f) provides in pertinent part:

> Whoever fails to comply with any provision of this section shall be liable to the
> borrower for each such failure in the following amounts:
>
> (1)   Individuals
> In the case of any action by an individual, an amount equal to the sum of –
> >    (A)    any actual damages to the borrower as a result of the failure; and
> >    (B)    any additional damages, as the court may allow, in the case of a
> >    pattern or practice of noncompliance with the requirements of this
> >    section, in an amount not to exceed $1,000. . . .
>
> (2)   Costs
> In addition to the amounts under paragraph (1) or (2), in the case of any
> successful action under this section, the costs of the action, together with any
> attorneys fees incurred in connection with such action as the court may determine
> to be reasonable under the circumstances.

12 U.S.C. §2605(f).  *See also Byrd v. Homecomings Financial Network*, 407 F. Supp. 2d 937,

945-946 (N.D. Ill. 2005) (holding "RESPA, 12 U.S.C.A. § 2605(f) . . . requires a party to show

actual damage from a violation of § 2605(e)(2) and where plaintiff could not do so she failed to

state a claim under RESPA as a matter of law."); *Collier v. Wells Fargo Home Mortgage*, 2006

U.S. Dist. LEXIS 35619 (N.D. Tex. May 26, 2006) (holding where plaintiffs alleged no damages

caused by failure to respond to qualified written requests, there was no RESPA claim under §

2605(e)).


Despite the fact that it is Plaintiff Carter's burden to show actual damages, she has failed

to present any specific evidence of such damages.  Rather, Plaintiff simply states that her

-24-

damages include the uncredited money she paid Defendant, damages for emotional distress, the additional costs she paid for refinancing her mortgage loan, and damages for her time and expenses she incurred in attempting to correct her account and her credit report.  Plaintiff does set forth the specific costs involved in refinancing her house, but fails to show how this is an actual damage caused by Defendant's alleged RESPA violation.  In fact, Plaintiff refinanced her home mortgage within 20 days of sending the September 9th letter that Chase allegedly failed to respond to.  The remaining damages alleged by Plaintiff Carter could not be caused by Chase's alleged failure to respond to her correspondence because such damages/expenses also would have been incurred by Plaintiff prior to the dates on the correspondence alleged in her RESPA allegations.

Plaintiff Carter argues that she suffered emotional distress damages for the first time in her Memorandum in Opposition to Defendant's Motion for Summary Judgment.  (Memo. at 17). Plaintiff failed to plead emotional distress damages in her Amended Complaint, and did not identify any emotional distress damages in her Rule 26(a) disclosures.  Defendant Chase argues, and this Court agrees, that Plaintiff is now barred from seeking emotional distress damages. "Rule 37 requires virtually automatic preclusion of information not disclosed pursuant to Rule 26(a)(1)." *Austrian Airlines Oesterreichische Lufverkehrs AG v. UT Fin. Corp.*, 2005 U.S. Dist. LEXIS 7283 (S.D.N.Y. Apr. 28, 2005); *see also Roberts v. Ground Handling, Inc.*, 2007 U.S. Dist. LEXIS 69992 (S.D.N.Y. Sept. 20, 2007) ("[P]laintiff failed to disclose these damages in her Rule 26(a)(1)(C) initial disclosures.  This is alone sufficient to preclude her from submitting evidence of it.").

In addition, the only evidence Plaintiff submits in support of her claim for emotional

distress damages is paragraph 15 of her Declaration, in which she states that she was a "nervous wreck" in September 2003, when she believed Chase had misapplied her August or September 2003 payments.  Defendant asserts that Plaintiff could not have been a "nervous wreck" as a result of any alleged failure of Chase to respond to her written correspondence because the statutory deadline for a response had not yet passed when Plaintiff Carter refinanced her loan.

Plaintiff Carter also argues that she suffered damages from Chase sending "erroneous credit reports to credit reporting agencies."  (Memo. in Opp. at 15).  Even if incorrect credit information had been provided to a credit reporting agency, Plaintiff would still be required to demonstrate that this resulted in an actual injury.  Again, however, Plaintiff Carter's failure to provide any evidence in support of the alleged damages is fatal to her claim.

The Court therefore finds that there is no evidence that Plaintiff Carter suffered any damages proximately caused by Defendant Chase's failure to respond to Plaintiff Carter's correspondence in accordance with RESPA.  Accordingly, the Court holds that Defendant Chase is entitled to summary judgment with respect to Plaintiff Carter's RESPA claims.

### 2.  *Plaintiff Webb's RESPA Claim*

Plaintiff Webb alleges in Count I of the Amended Complaint that "Chase violated . . . RESPA by . . . failing to meet the requirements of 12 U.S.C. § 2605 by failing to make payments of insurance from escrow accounts."  (Am. Compl. ¶ 78(b)).

12 U.S.C. § 2605(g) imposes specific requirements on a servicer such as Chase, specifically:

> If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow

account for such taxes, insurance premiums and other charges in a timely manner
as such payments become due.

Plaintiff argues that the clear language of the statute imposed an obligation on Defendant Chase to pay the Webbs' insurance premiums, and the terms of the statute do not require a receipt of a bill as a prerequisite to the obligation to make the timely payment.  Plaintiff Webb is essentially urging the Court to hold Defendant Chase strictly liable for not paying Plaintiff's insurance premiums.  However, in interpreting a statute that confers civil liability, a court must not impose strict liability unless Congress' intent to impose strict liability is clear.  *See Farm-Wey Produce, Inc.*, 973 F. Supp. 778, 782-83 (E.D. Tenn. 1997).  Nothing in the legislative history indicates Congressional intent to impose strict liability on a servicer under § 2605(g) of RESPA.  Thus, the Court will not impose the strict liability standard.

Defendant Chase counters and the Court agrees, that the analysis under RESPA is not that simple.  Plaintiff Webb wants the Court to find Chase liable without any consideration of the nature and extent of information a loan servicer has regarding the borrower's insurance policy, and the borrower's failure to respond to repeated requests to provide insurance information.  Defendant Chase relies on *Hyderi v. Wash. Mut. Bank, F.A.*, 235 F.R.D. 390 (N.D. Ill, 2006), asserting *Hyderi* is the only case to consider the intent required for liability under § 2605(g).  The *Hyderi* court held that:

RESPA does not necessarily impose strict edicts that operate without regard to the underlying facts, but rather indicates through its textual commands that fact–sensitive analysis is required.

*Id.* at 401.  The *Hyderi* court recognized that, in circumstances similar to the case at bar, a servicer "may not be liable if [it] sent correspondence to the borrower asking for insurance

-27-

verification that went unanswered." *Id.* The *Hyderi* court is consistent with other courts interpreting other provisions of RESPA to require a "reasonableness" standard for RESPA liability. *See Costa v. SIB Mortgage Corp.*, 210 F.R.D. 84, 89-90 (S.D.N.Y. 2002).

Applying the "reasonableness" standard for RESPA liability set forth in *Hyderi* to the instant case, the Court finds that Chase took reasonable measures to obtain current information from Plaintiff Webb regarding his insurance. Defendant Chase is therefore entitled to summary judgment on Plaintiff Webb's RESPA claim.

**B.    Counts III and VI – Breach of Contract / Breach of Duty of Good Faith and Fair Dealing[8]**

Plaintiffs broadly assert in Count III, their breach of contract claim, that "Chase has imposed or collected amounts that are not due and owing by contract including, without limitation, interest, prepayment penalties, and default-related fees, costs and charges." (Am. Compl. ¶ 89). Plaintiffs further assert that "Chase has misapplied or failed to apply payments, or imposed late fees and other charges not due and/or misused escrowed funds other than for their contractually agreed upon uses, all in breach of its contracts with Plaintiffs and members of the Class." (Am. Compl. ¶ 90).

With respect to Count VI, the breach of duty of good faith and fair dealing claim,

---

[8]    As set forth in the Court's Opinion and Order on Defendant's Motion to Dismiss (Doc. 31), under Ohio law, there is no tort cause of action for breach of the covenant of good faith that is separate from a breach of contract claim. Therefore, if a breach of duty of good faith and fair dealing is asserted as part of a contract claim, it must be alleged as part of that contract count; it cannot stand alone. *See Lakota Local School Dist. v. Brickner*, 108 Ohio App.3d 637, 646 (1996). Defendant, in their motion to dismiss, sought dismissal of Count VI. Plaintiffs countered that they were in compliance with Rule 8(e)(2) of the Federal Rules of Civil Procedure, which allows for a party to set forth two or more statements of a claim or defense alternatively, either in one count or two separate counts or defenses. The Court therefore permitted Plaintiffs to proceed with alternative breach of contract theories with the understanding that they may only recover on one claim or a combination of the claims, but not both. (*See* Opinion and Order at 12).

-28-

Plaintiffs assert

> Each state where Chase does business recognizes a duty of good faith and fair dealing with respect to conduct encompassed by contractual relations. Chase owes such duty to Plaintiffs and the members of the Class. Further, Chase is in a position to control the ongoing contractual relationship between it and each member of the Class and retains and solely administers, inter alia, the manner in which borrowers' payments are applied and credited to their respective accounts.

(Am. Compl. ¶ 108). In addition to these broad assertions, each Plaintiff has made specific allegations with respect to their breach of contract and breach of the duty of good faith and fair dealing claims which will be addressed in turn.

### 1. *Plaintiff Webb's Claims*

In Plaintiffs' Complaint, it is alleged that Chase breached the terms of Plaintiff Webb's mortgage when it "imposed or collected [insurance premiums that were] not due and owing under [Webb's] Mortgage. (Am. Compl. ¶ 87, 88). Plaintiff Webb further alleges that Chase breached his mortgage by failing to obtain replacement coverage "at the lowest available cost," when Chase obtained replacement coverage in "an amount far in excess of Chase's contractual authority," and improperly "backdated" Webb's replacement coverage. (Am. Compl. ¶ 33, 58, and 59). Defendant Chase counters that Plaintiff Webb's claim for breach of contract fails because the evidence demonstrates that Chase complied with the terms of Webb's mortgage.[9] The Court agrees with Defendant Chase.

### a. Collecting Insurance Premiums

---

[9] Defendant highlights (in support of its argument) the Court's March 5, 2007 Opinion and Order, which permitted Plaintiffs' claims for breach of contract and breach of duty of good faith and fair dealing to remain but cautioned "[D]uring the discovery phase, Plaintiffs will be required to disclose the specific contractual provisions they claim Defendant has violated and if nothing more specific is provided, this will most likely be an issue for summary judgment." Defendant asserts that Webb has never identified any specific mortgage provisions that Chase purportedly breached, despite Chase's requests.

Plaintiff Webb's mortgage agreement authorized Chase to obtain replacement hazard insurance when Webb's own hazard insurance lapsed.  Specifically, Webb's Deed of Trust required him to "maintain hazard insurance on [his] property in the amount and for the periods that lender required."  (Am. Compl. ¶ 52).  In the event Webb failed to maintain hazard insurance on his property, the Deed of Trust authorized Chase to "do and pay whatever is necessary to protect the value of the property and lender's rights in the property, including payment of . . . hazard insurance."  (Am. Compl. ¶ 53).  Further, Webb's mortgage provided that in the event Webb failed to maintain hazard insurance on his property, Chase could obtain such replacement insurance on his property, and that any funds Chase disbursed to pay the premiums for this insurance would become "the additional debt" of Webb that was "immediately due and payable."  (*Id.*).

Plaintiff Webb's primary argument is that there is a question of fact as to whether Chase possessed sufficient information to pay Webb's TFI premium when it came due in July 2003. Plaintiff asserts that Chase should have continued to pay his TFI insurance premium because it did so under a prior mortgage.  Further, Plaintiff argues that his loan file with Chase should have contained proof of the TFI policy as of the date he closed on his current loan.  Plaintiff, however, is attempting to generate factual disputes by using the terms of two separate loan agreements. Chase did pay Webb's TFI premiums under his prior loan.  Chase was listed as the mortgagee under the TFI policy and therefore received renewal notice and premium bills.  There is no question that as of March 28, 2003, when Plaintiff Webb refinanced with MIG to his current loan, the TFI insurance information was valid.  It is further undisputed that when Plaintiff Webb refinanced, Webb's wife directed TFI to delete Chase as the mortgagee on the TFI policy and to

send all insurance information to the new lender MIG, not Chase.  As a result, Chase was not

sent any information when Webb's renewal premium came due in July.  Chase began servicing

Plaintiff Webb's current loan on May 16, 2003, but did not receive any insurance renewal

notices or bills.  Chase therefore did not have any information as to what, if any, hazard

insurance Plaintiff Webb had.  Chase then contacted Plaintiff Webb to request his current

insurance information.  Plaintiff Webb failed to respond to Chase's request for information,

ignored correspondence from MIG directing him to send all insurance information, including

insurance bills to Chase, and disregarded a stream of correspondence from TFI alerting him that

his premium was due, then overdue.  Specifically, Webb's argument is that he did not receive

any of the following correspondence:

- May 12, 2003 Amended Declaration from TFI

- June 19, 2003 Statement of Insurance Premium due from TFI to the Webbs stating that the mortgagee, MIG, was billed

- June 20, 2003 cover letter and Renewal Certificate from TFI to the Webbs stating that the mortgagee was MIG and requesting that the Webbs provide a loan number to TFI

- July 22, 2003 final notice from TFI to the Webbs stating that TFI had not received the Webbs' premium payment, that their policy had been cancelled, and that to reinstate with continuous coverage TFI needed to receive the Webbs' payment by August 1, 2003.

- September 10, 2003 letter from Chase to the Webbs stating that Chase did not have current insurance information for their account, and requesting that they

provide it to Chase.

(Knight Depo. at 50-51, 59-60, 61-65, 68-69, Exs. 10, 13, 15, 16, 18; Baker Aff. Ex. F).

Regardless of Plaintiff Webb's claims that he didn't receive any of the above mail, there is a presumption in the Sixth Circuit that a properly mailed letter "reached its destination in usual time and was actually received by the person to whom it was addressed." *Hagner v. U.S.*, 285 U.S. 427, 430 (1932); *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 430 (6th Cir. 2007). While this presumption may be rebutted with evidence of non-receipt (*see Bratton v. Yoder* (*In re Yoder Co.*), 758 F.2d 1114, 1117 (6th Cir. 1983)), a bald denial of receipt, without more, is insufficient. *Ohio Cas. Ins. Co. v. Hoback* (*In re Hoback*), 200 B.R. 28, 31 (Bankr. W.D. Ky. 1995) ("To allow a simple denial of receipt, standing alone, to rebut the presumption would be to destroy the presumption entirely.").

Plaintiff Webb attempts to rebut the presumption with his own declaration, which was filed on November 13, 2007.[10]  In his declaration, Plaintiff Webb states, "I never received any notices from TFI in the Summer of 2003 about my insurance nor did I receive any correspondence" from Chase until receiving the October 27, 2003 letter.  (Webb Dec. ¶ 13). This "bald denial" is insufficient to rebut the presumption of receipt for summary judgment purposes.  *See Hoback*, 200 B.R. at 31; *see also Anderson v. Tenn. Valley Auth.*, 991 F.2d 794 (6th Cir. 1993).  Further, all of the correspondence that Plaintiff Webb claims not to have received was sent to the address of the insured's mortgaged property: 244 Foxfire Lane, Kingston, TN 37763.  Plaintiff has acknowledged receipt of, and even produced, numerous other

_____

[10] Defendant Chase argues that Plaintiff Webb's Declaration should be disregarded because it is undated, not notarized, and does not contain the language mandated by 28 U.S.C. §1746 for unsworn declarations in that it contains no representation that the declarant's statements are "true and correct."

correspondence sent to this address.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, - - U.S. - -, 127 S. Ct. 1769, 1776 (2007).  The Court presumes that Plaintiff Webb received all of the aforementioned correspondence, and therefore, it is because of Plaintiff's own inaction that Plaintiff's TFI policy was not renewed and no fault by Defendant Chase.

Plaintiff Webb also asserts in his declaration that when Chase began servicing Plaintiff's loan, "MIG sent another notice to TFI notifying TFI that [Chase] was the new mortgagee." (Webb Dec. ¶ 12).  The evidence shows that MIG prepared an Insurance Endorsement Request dated April 10, 2003, instructing TFI to change the mortgagee clause on the Webbs' policy from MIG to Chase, however, MIG has no record that this document was actually sent to TFI.  Further, TFI's records reflect that it never received this document.  (Rhea Depo. 41-43; Knight Depo. 54-55).  Again, Plaintiff Webb has failed to provide any evidence to establish that TFI and/or Chase was made aware of the change in the servicer of the loan.  Therefore, Chase did not breach any of Plaintiff Webb's mortgage documents in securing replacement insurance coverage on Plaintiff's property.  Rather, the fault appears to lie with Plaintiff Webb.

### b. Obtaining expensive replacement hazard insurance and improperly backdating

Plaintiff argues that the replacement hazard insurance obtained from ASIC was in excess of Chase's contractual authority or insurable interest in the property.  Plaintiff further asserts that Chase breached the mortgage by failing to obtain replacement insurance as soon as it lapsed, but rather waited until they discovered the lapse and then purchased insurance for the entire time the

insurance had lapsed.  (Pl.'s Memo. in Opp. 14-15).  Plaintiff Webb relies on *American Bankers Ins. Company of Florida v. Wells*, 819 So.2d 1196, 1202 (Miss. 2001) and *Gipson v. Fleet Mortgage Group, Inc*, 232 F. Supp. 2d 691 (S.D. Miss. 2002) in support of his argument.

*Wells* involved lender-placed automobile collateral protection insurance.  819 So. 2d at 1196, 1201-02.  The Wells' plaintiffs' security instruments did not include any language like that contained in Section 4 of Plaintiff Webb's Deed of Trust, reserving the right for Chase to require continuous insurance coverage.  The *Wells* court never held that the operative security agreements precluded the backdating of lender placed insurance, but rather that the lender "may not have had the right to backdate" under their terms.  *Id.* at 1201.  In the case at bar, Plaintiff Webb's mortgage agreement provided that Chase could obtain replacement insurance.  The Court finds that Chase did not improperly backdate the ASIC replacement policy as alleged by Plaintiff Webb.  Chase had to ensure that the property was continuously covered in the event that a loss had occurred during the lapse in insurance coverage because no inspection of the property was done.  If Chase had obtained replacement insurance effective as of the date it received confirmation that the property was no longer insured, and a loss had occurred in the interim, then there would be no coverage to satisfy Chase's security interest or the borrower's ownership interest in the property.

In *Gipson*, the Court held that there was a question of fact surrounding a commission payment, and therefore, summary judgment was denied.  There was evidence presented that established that the lender-placed insurer had paid the lender "commissions in order to obtain [the lender's] forced-placement insurance business."  *Gipson*, 232 F. Supp. 2d at 706.  The Court held that based on the filed rate doctrine, the borrowers' claims involved the placement of

insurance "in such a manner as to cause [the] borrowers' payment of unnecessary fees." *Id.* at

707. Defendant Chase argues that this case is not applicable as there is no such evidence in this

case.

Plaintiff Webb has also alleged that Chase was paid a commission by ASIC in exchange

for using ASIC's insurance as Plaintiff's replacement coverage, however, there is no evidence to

support Plaintiff's assertions. In fact, the evidence proves otherwise. Chase specifically stated

in response to Plaintiff's First Set of Interrogatories:

> ASIC charged Chase a $845 premium for the lender-placed hazard insurance
> coverage it provided for Webb's property between July 18, 2003 and November
> 7, 2003, which amount was paid in full by Chase to ASIC and debited to Webb's
> account with Chase. Neither Chase nor any related entity received any
> commission in connection with this transaction.

 (Def.'s First Supplemental Responses to Pl.'s First Set of Interrogatories, No. 10). Plaintiff

Webb has not presented any evidence that contradicts Chase's response above, therefore, the

Court concludes that Chase did not receive any commission in purchasing replacement insurance

for Webb from ASIC.

With respect to the allegation that the cost of the replacement insurance was excessive,

Defendant argues, and the Court agrees, that there is no provision in Plaintiff Webb's mortgage

documents that required Defendant Chase to obtain coverage at the lowest available cost. In

fact, Chase told Plaintiff Webb weeks before he finally reinstated his TFI policy that the cost of

any insurance Chase would obtain "is likely to be much higher than insurance you obtain on

your own . . . because the insurance we obtain is not based on the insurance company's appraisal

of your home." (Baker Aff., Ex. G). Chase therefore did not breach its contractual agreement

with Plaintiff Webb because there was no provision that required Chase to obtain the lowest-cost

replacement insurance in the event Webb breached his obligation to maintain insurance on his property.  Rather, Chase exercised its express rights under the mortgage in securing replacement insurance.  Chase therefore did not breach the covenant of good faith and fair dealing where it merely exercised its right under the mortgage.  *See Lawhorn & Assocs., Inc. v. Patriot Gen. Ins. Co.*, 917 F. Supp. 538, 543 (E.D. Tenn. 1996) (covenant of good faith and fair dealing is tied to the express provisions of the contract and cannot inject new duties or obligations into the contract); *see also Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 207 (6th Cir. 1995) (a party does not violate the covenant where its actions are authorized by the terms of the contract).

### c.    Filed Rate Doctrine

Under the filed rate doctrine, a ratepayer cannot claim that he or she was damaged by paying a filed rate because the legal rate has already been determined by the regulatory agency. *See Keogh v. Chi. & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922).  Further, "any 'filed rate' – that is, one approved by the governing regulatory agency – is per se reasonable and unassailable in judicial proceedings."  *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2nd Cir. 1994).  The two main purposes of the filed rate doctrine are to:

> 1) prohibit a regulated entity from discriminating between customers by charging a rate for its services other than the rate filed with the regulatory agency; and 2) preserve the authority and expertise of the rate-regulating agency by barring a court from enforcing the statute in a way that substitutes the court's judgment as to the reasonableness of the regulated rate.

*Randleman v. Fid. Nat'l Title Ins. Co.*, 465 F. Supp. 2d 812, 823 (N.D. Ohio 2006) (*citing Saunders v. Farmers Ins. Exch.*, 440 F.3d 940, 943 (8th cir. 2006)).  The filed rate doctrine does not preclude recovery of amounts paid in excess of the filed rate, but it completely forecloses any claim that a payment of the filed rate is excessive.  *Keogh*, 260 U.S. at 165.

-36-

Plaintiff Webb's property was located in Tennessee ,and the ASIC premium he was charged was based on the rate approved by the Tennessee Department of Commerce and Insurance.  The insurance industry is heavily regulated, and the Tennessee legislature has enacted a comprehensive scheme regulating virtually every aspect of it.  T.C.A. § 56-1-101, *et seq*.  This is especially true with the setting of rates.  ASIC was required by Tennessee law to charge a "filed rate" as the premium for the lender-placed insurance that Chase procured when Webb's own hazard insurance lapsed.  T.C.A. § 56-5-101, *et seq*.  Pursuant to T.C.A. § 56-5-305, all hazard insurers must file their proposed rates with the Tennessee Department of Commerce and Insurance prior to implementation.  The Tennessee Code establishes an exhaustive review and approval process with respect to insurance rates that includes standards for rate compliance, and the statute expressly provides that rates "[s]hall not be excessive, inadequate or unfairly discriminatory."  T.C.A. § 56-5-303.  Therefore, a duly filed rate that has obtained regulatory approval, such as the premium rate that Webb paid for ASIC replacement coverage, is deemed not to be excessive under the filed rate doctrine.

Plaintiff Webb, however, argues that his claims are not barred by the filed rate doctrine.  In the discussion on this matter, Plaintiff appears to alter his argument, asserting that this case is "not about being charged higher than normal insurance premiums.  It is actually about being charged unnecessary premiums, some of which were excessive. . .."  (Pl.'s Memo. in Opp. at 21).  The Court has previously held that Chase acted in accordance with the mortgage agreement in charging Plaintiff Webb for the replacement insurance coverage.  Further, with respect to the allegation that such premiums were excessive, the Court again held that the terms of Plaintiff Webb's mortgage authorized Chase to "do and pay whatever is necessary to protect the value of

the property and lender's rights in the property, including payment of . . . hazard insurance."

(Baker Aff. Ex. B, Sec. 7).  While the Court believes that the filed rate doctrine would most

likely apply in this case, Plaintiff's shift in arguments makes it unnecessary for the Court to

reach such a conclusion.

Plaintiff Webb has failed to set forth sufficient evidence to establish a claims for breach

of contract or breach of the covenant of good faith and fair dealing.  Defendant Chase is

therefore entitled to summary judgment on these claims.

### 2.      *Plaintiff Carter's Claims*

Plaintiff Carter alleges in Count III of the Amended Complaint that Defendant Chase

either: (1) failed to properly credit her mortgage payment; (2) improperly assessed late charges;

or (3) improperly obtained reimbursement for its attorneys fees incurred in her bankruptcy.

(Am. Compl. ¶ 67, 73-75, 87-88).  Defendant argues, and this Court agrees, that Plaintiff

Carter's breach of contract and breach of the covenant of good faith and fair dealing claims fail

because Chase has properly credited and accounted for all of Carter's loan payments, and

refunded all of the late charges and attorneys' fees to which she claims she is entitled.

Defendant Chase has thoroughly explained through the affidavit of Deborah Baker that

all payments made by Plaintiff Carter were credited to her account.  Other than the late charges

and attorneys' fees that were later refunded to Carter, her account balance was reduced to zero

when Chase returned the $420.82 unapplied funds balance to her in October 2003.  Plaintiff

Carter has not presented any evidence to show that there are some unapplied funds that have not

been credited to her account.

Although Plaintiff Carter's mortgage expressly authorized Chase to assess late charges in

connection with Carter's partial payments, and to obtain reimbursement of its bankruptcy attorneys' fees, Carter admits, and the evidence confirms, that at the time she filed this lawsuit, all late charges and all attorneys' fees that Carter paid Chase had been refunded.  (Am. Compl. ¶ 74-75).  These refunds were made a year before she filed this lawsuit, and therefore, Carter lacks standing to assert any claims relating to the assessment of late charges or to the attorneys' fees that were reimbursed by Chase in connection with her bankruptcy proceeding.  *See Jones v. Takaki*, 832 F. Supp. 1224, 1225 (N.D. Ill. 1993) (no standing where the injury the lawsuit seeks to redress was eliminated prior to filing the lawsuit).

In determining whether a plaintiff has standing, a court is required to look to the facts as they existed at the moment in time when the lawsuit was filed to determine whether, at the time, the plaintiff had suffered an injury-in-fact.  *Keene Corp. v. U.S.*, 508 U.S. 200, 207 (1993); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 (1992); *Ailor*, 368 F.3d at 596.  If at the time the complaint is filed, the injury has already been redressed, the plaintiff does not have standing to bring his or her claim.  *See Ailor*, 368 F.3d at 599.  Plaintiff Carter filed this lawsuit on June 3, 2005.  The undisputed facts at that time were that all late charges and attorneys' feed paid by Carter had been refunded in 2004.  Therefore, Plaintiff Carter was suffering no "injury-in-fact" when she and Webb filed this lawsuit and there is no injury to "redress."

Furthermore, the indisputable evidence shows that Chase complied with the express terms of Plaintiff Carter's mortgage.  Plaintiff's mortgage expressly authorized Chase to place her partial payments in a suspense account, to assess a late charge when Carter failed to make her periodic monthly payments in full, and to obtain reimbursement for its bankruptcy attorneys' fees.  Plaintiff has failed to set forth any evidence in support of a breach of contract claim.  In

-39-

addition, no covenant of good faith and fair dealing terms may be implied that would contradict the aforementioned express contract provisions. Therefore, Plaintiff Carter has failed to establish claims for breach of contract and breach of the covenant of good faith and fair dealing. Accordingly, Defendant Chase is entitled to summary judgment on these claims.

### IV. CONCLUSION

In conclusion, Plaintiffs Webb and Carter have failed to maintain claims for violation of RESPA, breach of contract, and breach of the covenant of good faith and fair dealing.

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff Webb's claims and **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff Carter's claims.

The Clerk shall remove Documents 49 and 50 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.


**IT IS SO ORDERED.**


     */s/ George C. Smith*                                  
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**